Okay. Product liability. Yes, let me switch hats here. I think the court is factually familiar with a lot of the issues, and our primary argument in the trial court is there are a myriad of disputed facts that the courts, for want of explanation, went overboard to decide in favor of Taser Int'l, the appellees, in this case. With comments such as, you know, it is presumed that and that the facts, even though plaintiffs, the city of Madera, have disputed this, the court is going to find it to be undisputed. This was a summary judgment issue. I don't believe that's the province of the trial court and that we cited no less than 10, I think 11 factual issues, material factual issues that are questions of fact that could not have been decided on summary judgment. And, I mean, I'm not going to go through all those. I assume the court is familiar, intimately familiar with those questions of fact. But the court, the trial court also misapplied the substantive law. And granted, under diversity jurisdiction, the trial court necessarily must decide issues of State law. However, I believe the trial court is somewhat limited in that capacity in that it's not permitted to make new law under State court provisions, which ---- I think that the court can decide what it thinks that the California court would have held. I agree entirely, Your Honor. But I think what happened in this case, and getting to the legal issues, if you will, under the products liability theory of this case, there are two tests under the California Supreme Court, the consumer expectation test and the risk-benefit test. Unfortunately, what the trial court did was to latch on to the consumer expectation test, which requires the use of the product. And I'm sure, as the Court is aware, that became a central focus in the trial court's very lengthy opinion, was that the product in this case, the M-26 taser, was not technically used. And what the trial court did was said that we believe or the court believes that use requires actual touching or application of the product at hand. The court regrettably got distracted on this use issue because under the alternative and the applicable risk-benefit test, there is no use component. And in fact, what the California Supreme Court has said in Barker is that if the benefits of the design, in this case the M-26 taser, do not outweigh the risks of inherent danger, then the risk-benefit test must apply. And all of those issues, the analysis of the five points under the risk-benefit test, are all questions of fact for the jury. What would be the procedure here that if the city settles with Tories or if it goes to trial, you decide that first, and then the product liability case goes before the court, or would the court try it all at one time? I think that factually, and I don't want to speak for the trial court, Judge Ishii, I think the intent was to try all of the factual issues, and the case has been consolidated, certainly for discovery and procedural points. I don't believe, and there's not yet a motion pending, to bifurcate the two issues. I think that one jury, it would not be expedient for one jury to hear one factual set and then the other factual set as the product liability. I think they're all inextricably intertwined, and I think as to damages and accountability, it would almost be analogous to a comparative fault. Yes, the city of Madera, Officer Noriega, are clearly at fault and responsible for the death of Everardo Torres. We've never denied that. Certainly, we believe it's strictly under a negligence theory, State law theory. So if we have liability, and whatever the value of that case is, to what extent, if any, is Taser responsible or did they contribute to that death, because they designed the M26, and clearly by their own admissions and everything in the record, they designed it specifically to look, feel, and operate like an officer's handgun. There's no question that they recommended that it be carried on the officer's stronghand side, which are all design issues that ---- That was after consultation with the police force. Well ---- At least that's what it says. And that's interesting, because those were people, those were police officers hired by Taser International. They are paid to consult, and they came up with the opinion that, you know what, this handgun configuration will be more effective. And clearly, in some respects, it was. The old Tasertron was a flashlight configuration that you could point at and couldn't hit the broad side of a barn. Certainly, delivering this in a handgun configuration was more effective for the delivery of the Taser darts. The problem was, when they told the officers, and by their own admissions and their own training. Let me just ask a couple of questions. Sure. Was Madeira required to use, employ Tasers or issue them to their officers at all? Oh, no. They could have decided that they didn't want to use them. They could have. Indeed, there are police departments across the country that have made that decision, aren't there? There certainly have. There are many agencies that are continuing to sign up to use the Tasers. Taser has since designed the X26, which is 60 percent smaller and lighter. Let me go ahead and finish my questions. Oh, certainly. When Madeira decided, the police department decided to purchase Taser weapons in this form, there were other alternative designs, weren't there? To the Taser? Yes. No. It was the only Taser available was the M26 at the time of purchase. And the time throughout this period up until the death of Herodotus. That leads to my next question, which is the dual holstering, if you will, was not the only option available to Madeira. Yes, in fact, it was. The only holster that was available was the thigh mount holster, because the M26 was too big to fit on most officers' duty belts. So the only alternative configuration would have been to put it in a cross-strap. It's the same holster. You just turn it around, but then that puts the grip of the weapon. I understand, and there are reasons for the—apparently the police department had reasons for doing that. But they chose the dual holstering, if you will, configuration, right? It was the dual holstering, and I'm not sure—the thigh mount was the only holster. Okay, the thigh mount. Let's call it that. Yes, that was the only holster available. And Taser—excuse me, Madeira chose to purchase Taser because of solicitations by Taser. They sent out a pro forma, if you would, that said, you can save $267,000 if you purchase our M26 Taser. They sent—Taser International sent a prototype. Here, take it. Try it out. See if you like it. And then, if you do, purchase them. Taser International knew that Madeira was purchasing 60 of these M26 Tasers and, in fact, knew because the order was for, I believe, 37 right-handed holsters and the rest were left-handed, implying that the majority of people are right-handed. That's going to be the mount, and the other would be on the strong hand, left-hand side minority. But Madeira could have chosen to buy all left-handed holsters for right-handed people, right? That would have kept it away from the problem we have here. Well, that would have defeated Taser's own theory that you take advantage of the muscle memory and the training because an officer would be using his weak hand side and there is no training or muscle memory for an officer's weak hand side. In the majority of cases, that would be the left side. That would defeat Taser's own recommendation that you use your strong hand either on the strong hand side or in a cross-draw configuration. So that really wasn't an option or viable option. And, frankly, the questions that the Court is asking. It was an option to the city. The city could have said, we don't take your suggestion. We want right-handed officers to use a left-handed Taser and vice versa. Certainly an option, but I don't think a viable from officer safety or efficiency. And, frankly, these are all very good questions, but I think they're questions of fact that would need to be borne out with a jury as to whether that was a viable option, whether that was an appropriate option. The issue here is all of these questions of fact should not have been decided on summary judgment and should have been presented to a jury. And maybe a jury determines that, yes, all of these things, Madeira could have, should have, would have done. But these are not questions that should have been decided by the trial court on summary judgment. And so I think that the threshold issue here is, are there disputed issues of material fact, and I submit that there are many in this case, that precluded the trial court from granting summary judgment, notwithstanding the, what I believe is the misapplication and, unfortunately, the trial court getting off on this tangent of this use issue as under the consumer expectation test and the risk benefit test, not to mention the duty to warrant issue, which is a huge part of our case. Taser International knew when they sold these tasers to Madeira that there had been, one, prior this Sacramento incident, a weapon confusion. Yet they said nothing. And the facts are that the month after that Sacramento incident was when Taser had their initial public offering of stock, I believe a huge factor as to why they would not want to make that weapon confusion in Sacramento public. They then waited September 2002. We have the Minnesota incident. Same thing. Their own expert, Sid Hill, a highly respected commander of the Los Angeles Sheriff's Department, said when that second incident happened in Minnesota, all the warning lights went off for L.A. Sheriff's Department. Everybody in the industry said, who knew about that, said, time out, we've got to come up with a better configuration. Maybe we need to go to the cross-hand side. Maybe we need to go to the weak-hand side. And, in fact, Taser was at that time developing a better design. Again, another question of fact. Is there a more efficient, more cost-effective design? And we now know that the X-26 replaced that. Taser International, since the Torres case, the third incident and the only fatality, has now implemented into their training, which they require, don't ever put the M-26 Taser on the strong-hand side because now we know, although we didn't disclose until the third incident, this one, Torres, that there's a huge weapon confusion issue. When was the first warning given by Taser and in what form? April 2001, they sent out this client bulletin to tens of thousands of people. Anybody they got a business card at a conference or whatever, they stick them in their e-mail list. And they mass send these things out. The key is Madera wasn't even a client in April 2001 and would have no reason to have, one, we don't even know if they received, but if they did, to have paid attention to it because they weren't looking at Tasers. And the warning, if you will, the sufficiency of the warning, was item number six, okay, in a training bulletin that goes out to tens of thousands of people, and it wasn't bold-printed warning, caution, weapon confusion issue. It basically says that there's an alternative, you might want to wear these in the crosshand. It didn't say we've had weapon confusion issues. It didn't say there have been accidental shootings. There was no warning. What better warning did Madera need than the prior incident involving Officer Noriega? Well, as in the last case I mentioned, Sid Hill, their expert, L.A. Sheriff's commander, said, the Sacramento incident where there was an actual shooting, not fatal, was viewed as an anomaly. Nothing more need be done. In Madera's case with Officer Noriega, she accidentally drew it. That's even more than an anomaly, and Sid Hill said his commanders wouldn't have done anything different than what Madera did. All of L.A. Sheriffs would have done is said, okay, practice and make sure it doesn't happen again. Do you want to save a little time? I would, yes. Thank you, Your Honors. We'll hear from Taser International at this time. Good morning, Your Honors. I'm Nick Ghetto on behalf of Appellee Taser. Your Honors, having lived with this case for much longer than you've had an opportunity to look at it, I would like to urge you not to complicate the simple. All three of Plaintiff's theories of strict liability, negligence, and breach of warranty can be determined based on the causation issue. Causation represents an essential element of all three of those claims. With respect to each of them, Plaintiff has advanced two theories of defect, one, the design defect that the Taser was, quote, designed to resemble a standard handgun, end quote, and two, the purportedly inadequate warnings. Counsel, if we were to ‑‑ if the Taser had been differently designed, this probably wouldn't have happened. Is that right? I don't believe that is correct, Your Honor. The undisputed evidence ‑‑ let's back up a step. The allegation in the operative first amendment complaint was that the design is defective because it's designed to resemble a handgun. Our moving papers established that, in fact, Officer Noriega never looked at the Glock, the weapon, when she pulled it and shot Mr. Torres. But if they felt the same ‑‑ But that's the key. There's no evidence that they did. And let's back up a step. Remember, the operative complaint alleged that the defect was that it was designed to resemble a handgun. Our moving papers established that these visual clues were irrelevant because she never looked at it. That alone would be enough to meet our burden of proof as the moving party, I submit. But irrespective of that fact, the undisputed facts from Noriega's own testimony also established that she did not feel the grip of the weapon and that she did not feel the trigger of the weapon. So there's ‑‑ not only is there no evidence that these type of tactile clues or tactile sensations had anything to do with the accident, but there's no evidence that they did not. In fact, the undisputed evidence shows that they did not. What do you think she thought she was doing? I have no idea. There's ‑‑ I believe it's ‑‑ it cannot be determined from the record. Her testimony makes it sound like ‑‑ Well, she thought she was drawing the taser. You'll have to concede that. Oh, I don't think there's any dispute about that, Your Honor. Thank you. But, you know, from her testimony, the only inference we can draw is that her brain was literally receiving no signals that her senses were giving her. She didn't look at whatever weapon she intended to draw in the first place, but she also did not even feel it. Her testimony is, I did not feel the molded grip of the Glock. I did not feel the trigger. So there's no evidence that any tactile sensations had anything, any causal connection with the accident, and there's no evidence in the record that there's any similarity between the weight, feel, configurations, shape of the grip and the trigger of the two weapons. What's the difference in weight? There's no ‑‑ the record is silent. It's silent as to that. As to the weight. And, again, given the situation where this woman could not even feel the grip or the trigger and the silence of the record on any other specifications or any other characteristics of the weapons other than that the Taser is in general designed to resemble a handgun dictates that Taser has met its burden as a moving party. That burden shifted to plaintiff, and plaintiffs failed to present any evidence to controvert the testimony that there were no visual or tactile characteristics of the weapon that had any causal connection with her drawing out the Glock instead of the Taser. We now have in evidence several incidents of confusion, do we not, of the two weapons? Well, in terms of what's actually in the record, the record showed that there were two prior incidents in Sacramento and Rochester. Was the discharge made in those cases or just they were pulled and they found out they had the wrong weapon? I believe there were shootings in the two prior incidents, Your Honor. But to get into that issue and plaintiff's counsel's comments regarding the Sid Heal testimony, there's two very important points to remember about that testimony. One, Judge Ishii at the trial court level correctly sustained Taser's objections to the unauthenticated deposition testimony that was submitted. And two, irrespective of those objections and even assuming that the evidence were competent, Heal's testimony regarding this being something being an aberration and another thing setting off red lights and another thing doing something else is irrelevant. The key was the admissions in the testimony of Plaintiff, City of Madera's own commander, Steve Frazier, that when Noriega reported that prior incident where she drew but did not shoot the suspect, the proper response by her supervisor Lawson should have been to send her back for more training and not only that, but that they should have seriously considered that, he said, what they should have probably done was send her back to start from the scratch and redo the entire weapons training program and that anything else would be a supervisor not doing his job. So by Lawson, which, again, Frazier indicated was a completely inadequate response. The correct response should have been to re-evaluate everything and probably to send her back to redo the entire training course. That's the case. Sotomayor Is that a jury question? Bursch When you're saying that, what are you referring to specifically? Sotomayor As to the adequacy of the training? Bursch When you're saying the adequacy of the training, if you're referring to the adequacy of Lawson's response? Sotomayor Yes. Bursch No. I think Frazier's testimony is an uncontradicted admission by a commander, a policy-making, policy-level representative of plaintiff, that the proper response would have been to go back to the drawing board, you had to re-evaluate everything, and then after that re-evaluation, probably to send her back to redo the training course completely. But certainly, just to tell her, well, go off and practice on your own and see if you can get better is, as a matter of law, an inadequate response given Frazier's testimony. Kagan There was her testimony that she, in fact, did practice. Bursch Yes. She followed Lawson's recommendation to, you know, practice drawing one and then practice drawing the other and in a sense, in essence, come up with your own training regime and see if you can figure it out yourself. But again, a completely inadequate response. I also wanted to address one other comment that plaintiff's counsel made regarding the purported recommendation made by Taser to carry it on the strong side. In fact, the record, an excerpt of record, page 392, if you go through that deposition testimony line by line, it actually reflects that there was a hearsay statement made, I believe, I forget if it was Frazier testified, he heard somebody else, or Williams testified that he heard somebody else say that Taser recommended the holster. But that's not necessarily the same thing as recommending a strong side draw versus a weak side draw. Remember, there are three configurations. With the strong side draw, the officer draws it in the normal manner with his dominant hand. In the weak side draw, he reaches over with his dominant hand and draws it from a left-hand, the non-dominant side for me would be the left-hand side holster, which is holstered in the normal configuration with the weapon grip facing behind the officer. In the cross draw, you use, I might have misspoken. In the weak side draw, you use your non-dominant hand and draw it from the left side. Kagan. Could the holster be mounted on either side or would it have to be? Not only could it be mounted on either. Well, that's correct. In other words, for a right-handed person like me, if you want the cross draw, you can take the right-hand holster, transfer it backwards on the left side, and then the grip faces outward, faces in front of me, and I draw it with my dominant hand, as opposed to the weak side draw where the grip is facing behind me, and I draw it with my left hand and transfer it to my dominant right hand. Are you saying there was no recommendation made by Taser? The only evidence in the record is that there was a hearsay statement that I heard from somebody else that Taser recommended the holster. But that, again, you have to. A holster but without any specifications. That's right. There's no evidence in the record that Taser made any specific recommendation regarding strong versus weak versus cross draw. You can recommend a holster, but, again, you've got all three of those options with that holster. Now, you indicated that you would mount it backwards on the other side or upside down. It's mounted with a cross draw. The record indicates that you can mount it. You can take, for a right-handed person like me, you can take a normal right-hand side holster, mount it on my left side, but it would be reversed so that the grip of the gun would be facing out. It would be facing out, and you grab it with your dominant hand. And there's testimony from, I believe, Frazier and Williams that they discussed that option when they were doing the purchase and negotiation period for the Tasers, and they rejected it, as Mr. Pratt indicated, because they felt it would leave the officers more vulnerable to having a suspect come up and take it from their left side. Now, when they ordered a certain percentage of them for left hand, was the holster identical to the one for the right hand? For the – my understanding from the record is for – if you are using a weak side draw, that would be a left-handed holster for a right-handed person. It goes on the – on the weak side draw, the holster is on the opposite of the dominant hand. But they wouldn't just say turn it over and use the same one. They would furnish a different holster for the left. For the weak side draw, correct. Or for somebody who is left-handed. If you're doing the cross draw, you use the dominant side holster, but you attach it on the non-dominant side. Okay. So, again, the fact that – even if you're accepting the hearsay evidence that holster – that, excuse me, Taser recommended this make and model of holster, that doesn't tell you anything about whether that holster is going to be used on the strong side, on the weak side, or on the cross draw and, you know, again. Was Officer Noriega using the Taser? At what point? The day of the accident. Getting into the use issue. Before I answer that question, I'd like to make one preparatory comment, which is that it's my position that ultimately the use issue is a red herring because Yeah, I know, but you just answered my question. Okay. Leaving that aside, it's our position that she did not use it. She did not touch it. She did not pull it out of the holster. She did not discharge it. As Judge Ishii noted, under any reasonable definition of use, she was not using it on that day. There is – we cited the Powell decision in our papers, which indicates that under California law, where there's an issue about inadequate warnings, there are only very limited situations in which a liability can be imposed on a defendant where the person who was using the product was not using that defendant's product. Essentially, it has to be a situation where the product that was actually used was identical to the defendant's product. The products have to present the same risks, and the warnings have to be substantially similar.  Thank you, Your Honors. Thank you for your argument. Counsel Rebuttal. Thank you, Your Honors. Counsel makes a very good point. Causation is a central issue in this case. The California Supreme Court in Ortega v. Kmart said causation is a question of fact for the jury. As to whether this is a defective design, Judge Fletcher pointed out, there have now been, we know, five incidents where the M26 taser has been confused by highly trained police officers. That's a question for the jury. If five trained police officers end up shooting somebody with the wrong weapon and they're carrying the M26, that's clearly a question for the jury. As to whether or not use is required, to answer Judge Fletcher's question, the reason, and the trial court made the leap of defining what use could entail, and in this case concluded that it was not used. There's a reason the California courts have not defined use, because under the risk-benefit test, which is the applicable test, use is not an element. The only case we could find was a 1952 California Supreme Court case of intended use, which is where the individual reached for the Coke bottle, intending to use the Coke bottle. It exploded, and in fact, in that case, the Supreme Court found products liability attached. But I submit that the reason there's no definition under California law is because use is not an issue. And they've even conceded it was a red herring in this case. What was the officer thinking? She was clearly thinking, and there's no evidence otherwise, that she was thinking she was going for her taser. The issue of the holster, whether or not Madera could have gotten a different holster or whatever, or whether it was recommended, that's only a minutia of this case. The issue is the M26 taser. And I would submit, Your Honors, that real quickly on the issue of Sid Hale, his authenticated transcript was not available at the time until after the Court had rendered its opinion. And the Supreme Court has said, don't decide these on technicalities, evidentiary issues, let that be decided by the trial court. We submit, Your Honors, that it's too many questions of fact. This is a products liability case that necessarily needs to go to the jury. Okay. The case just argued will be submitted now. I'd like, Mr. Douglas, will you step forward, please? Counsel, step forward. The case just argued will be submitted for decision. We're going to decide these cases, but this is a tragic loss of life. The city admits there was negligence involved in the incident, and I compliment you for your candor on that. You can continue to litigate these matters and decide whether there should be product liability, whether there really is a civil rights case involved. And if we have to, we'll decide those. But I would like to suggest to you that we have a wonderful mediation unit in this Court that is very adept at resolving cases like this. These are employees of the Court. They're not retired judges, lawyers in practice with conflicts of interest. Their only desire is to bring cases to resolution. If that appeals to the three of you on behalf of your clients and your clients' legitimate interests, the circuit mediation office is at the bottom of the stairs to the right as you go out, and they have full power to take control of a case if you decide to mediate it. But this just seems to me to be a case where you ought to try to resolve it if you can, get this family paid for this tragic loss of life, put these product liability and civil rights questions behind, and get to the goal I think that you all want to get to. So I just offer that. Thank you both, all of you, for your arguments. Thank you. Do you have any questions? Let's do it. Is it a time limit for them to get back to us as to whether they're going that route? How much time do you think you need to confer with your client and make that decision? One week, seven days. Do I have a question? Until the end of the month? How does that sound to you? That's fine. We're amenable to any of those options. Okay. You let us know by the end of the month. Thank you, Your Honor. Okay? Thank you all for your arguments. Thank you, Your Honor. Appreciate you coming in. As we said, the case disargued will be submitted for a decision, and the Court will stand in recess for the day. All rise. This Court, for this session, stands adjourned. Thank you.
judges: B. Fletcher, Siler , Hawkins